IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 25, 2014

**STATE OF TENNESSEE v. BILLY D. RAPIER**

**Appeal from the Circuit Court for Madison County**
**No. 13233     Roy B. Morgan, Jr., Judge**

_____

**No. W2013-02297-CCA-R3-CD  - Filed November 26, 2014**

_____

Defendant, Billy D. Rapier, and two co-defendants, Cassandra Haynes and Leveris Keller, were charged with aggravated robbery. Mr. Keller was also charged with felony evading arrest, and Defendant was charged with evading arrest. Pursuant to a jury trial, Defendant was convicted of the charges and received concurrent sentences of eight years for aggravated robbery and eleven months, twenty-nine days for evading arrest. On appeal, Defendant argues that the evidence was insufficient to support his convictions because the defense of duress barred his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Lee R. Sparks, Jackson, Tennessee, for the appellant, Billy D. Rapier.

Herbert H. Slatery, III, Attorney General and Reporter; Meredith DeVault, Senior Counsel; Jerry Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**FACTS**

On December 2, 2012, Santebial Buchanan, who was the assistant manager, and Shaquana Underwood were working at the Dollar General Store on Airways Boulevard in Jackson. At approximately 7:00 p.m., Ms. Buchanan was waiting on customer Derek Byrum when she looked up and saw three black males wearing masks and bandanas enter the store.

She observed that two of the men had guns. One of the men, who was wearing a clown mask and appeared to be the leader, jumped over the counter. The men were telling her: "Give me the mother f - - - - - g money." Ms. Buchanan testified that there were guns pointed at her face, and she felt as though she was going to die. She then gave the men money from her register. They also demanded money from the other register being used by Ms. Underwood. Ms. Buchanan could not open the register at that time because she needed Ms. Underwood's "pass code." Ms. Underwood had gone outside after the three men entered the store. Ms. Buchanan testified that Ms. Underwood was brought back inside the store at gunpoint by the man in the clown mask, and she gave Ms. Buchanan her pass code. Ms. Buchanan opened up the register, and two of the men, including the one without a gun, took the money out of the drawer.

Ms. Buchanan was next ordered to open the safe which was located on the floor beside her cash register. The man in the clown mask still had his gun pointed at her. After Ms. Buchanan opened the safe, she heard police sirens, and the men left the store. Ms. Buchanan ran over and locked the door.

The parties agreed to read Ms. Underwood's statement into evidence. Ms. Underwood said that she was near the third cash register by the door stocking gum when the three men entered the store. She eased outside and saw a man outside who did not have a gun. Ms. Underwood stated:

> He was like, ["]I ain't with this shit. I ain't with this shit. You good.["] And I just stood in the parking lot. While I was out there, the tall guy with the clown mask and red pullover came and got me. He grabbed me, he put a gun in my head saying, ["]Give me your f - - - - -g number.["] I said, ["]Give who my number,["] and he brought me inside. He told me again to give her my f - - - - - g number, and I did. Ms. San[tebial] punched in the number and the dude behind her took the money. The tall guy backed up and so did I. He stood in front of me and told me not to move and I didn't. After that, they went to the safe and got the money out [of] the safe and left. I think the tall guy had something on his jaw like a scar line or something. The guy behind [Ms.] San[tebial] had a mini Afro and was light skinned. He was about 5'8" or 5'9". The one outside was covered from head to toe. He had on a purple bandana I think. He had gloves on and was the shortest. He was about 5'4" or 5'5". The tall guy with the clown mask and red pullover was about 6'1".

Christopher Derek Byrum testified that his girlfriend worked at the Dollar General Store on Airways Boulevard, and he was there on a daily basis and knew everyone who worked in the store. At approximately 7:00 p.m. on December 2, 2012, Mr. Bryum had

completed a purchase at Ms. Buchanan's register when he saw three individuals run into the store wearing masks and bandanas. He said that one of the individuals was wearing a clown mask and one had a "bluish-purplish" bandana. He also saw one of them with a chrome revolver. Mr. Byrum walked out the front door and saw another man standing outside in front of the door. Mr. Bryum testified that the individual said, "Man, I'm no part of this. I know you're cool, you're cool. You ain't got to run off[.]"

Mr. Byrum testified that he got into his vehicle and dialed 911 as he was leaving. He said that the man in the clown mask walked outside as Mr. Byrum was leaving. The man was armed with a black gun. Mr. Byrum then observed the men take Ms. Underwood back inside the store. Mr. Byrum drove to the gas station next door and parked behind the diesel pumps so that the men could not see him.

Deputy Jessica Thornton of the Madison County Sheriff's Department received a dispatch concerning a robbery at the Dollar General Store on Airways Boulevard with a description of a dark-colored van possibly involved in the robbery. Deputy Thornton located a van matching the description on Highway 223, a few miles from the store. She alerted other officers, and she began following it. Sergeant Brandon Moss, a K-9 officer with the Jackson Police Department heard Deputy Thornton's radio call and drove to the area to assist her. Sergeant Moss' K-9 partner, Kira, also rode with him. Deputy Thornton verified the description of the van and then activated her emergency equipment. The driver of the van stopped as it was exiting onto Interstate 40 (I-40) on the end of the exit ramp. As Deputy Thornton exited her patrol car and Sergeant Moss arrived, the driver of the van took off at a "decently high rate of speed." She got back into her car and began chasing the van with Sergeant Moss behind her. Investigator Samuel Gilley of the Jackson Police Department also joined the chase. The van traveled westbound on I-40 for approximately 8.2 miles with speeds reaching over one-hundred miles per hour. The chase ended when the van tumbled down a steep embankment at the top of the exit ramp at Exit 68.

Deputy Thornton, Investigator Gilley, and Sergeant Moss exited their patrol cars, and other officers arrived on the scene. Sergeant Moss hooked Kira up to her leash, and they ran down the embankment toward the van. The other officers had three occupants of the van held at gunpoint, and they advised Sergeant Moss that one suspect, Defendant, had fled on foot. Kira began tracking Defendant, and after he was located, Sergeant Moss gave him several commands to stop. Investigator Gilley was behind Sergeant Moss and also told Defendant to stop. Defendant continued running, and Sergeant Moss released Kira, and she apprehended Defendant by biting him on the rear end. Sergeant Moss noticed cash lying in the area where Defendant was apprehended. Investigator Gilley handcuffed Defendant and searched him. There was money underneath Defendant, and he also had money wadded up

inside his pockets. Defendant also had some change, a couple of bandanas, and a glove with him.

Captain Christopher Wiser had arrived on the scene and participated in taking the occupants of the van into custody. He then helped search the path that Defendant fled after leaving the van. Captain Wiser located a silver revolver twenty to thirty feet from the front of the vehicle. Officer Charles Crowe of the Jackson Police Department testified that he arrived on the scene and ran down to the van. He observed a female inside the van who was unconscious, and two other individuals were inside the vehicle. Officer Crowe also processed the scene and collected money in the amount of $193, bandanas, gloves, a watch, and a weapon. All of the items were recovered from the path used by Defendant when he ran from the van.

Lieutenant Phillip Stanfill spoke with Defendant at the Criminal Justice Center after Defendant had been taken into custody. He advised Defendant of his *Miranda* rights, and Defendant signed a waiver of those rights and gave a statement. Defendant told Lieutenant Stanfill the following:

> I didn't talk to Big yesterday. He came to Cassandra's house tonight. He was talking to her in code. He did not personally tell me what was going on. Me, Cassandra and Cory got in his green van at Cassandra's house. We went to the store, Family Dollar or Fred's. Cassandra went in to get drinks. We all stayed in the van. They were riding around. Big drove to the strip mall where Dollar General is. Cassandra got into the driver's seat. She drove over to Dollar General. She parked on the side. Big was saying, ["]Let's just do this.["] I hesitated because I knew it was wrong. I was thinking Cassandra would tell him to stop. She went along with it.
>
> We got out, me, Big and Cory. Big had on a clown mask. I put a green bandanna and a blue bandanna on my face. Cory had on all black. Big had a black gun. Cory had a silver gun. I didn't have a gun. I kind of stayed back because I knew this was stupid. Big told us what to do. Big said, ["]Get the money.["] A black girl and a white man were outside. All three of us went in. I stayed back until Big started demanding that I come on. They were pointing the guns at people and saying, ["]Give me this and give me the money.["] There was two black girls in the store. I had talked to a black girl and a white guy out of the store. I didn't try to stop them from leaving. Big got real mad that I didn't stop the white guy. He said, ["]what's wrong with you? He's going to tell.["] Big made the black girl go back inside. He kept saying, ["]Give me the number,["] to the black girl. Cory, me and Big got money. I

-4-

took money off the counter. Cory had took it out. We put it in pockets. I didn't hit anybody. Big was in the back while Cory was talking to the girl and getting money.

We left and went to the car. Cassandra drove. Big sat up front on the passenger's side. Me and Cory got in back. I was in the middle. Cory was in the very back. Cassandra pulled out. We ended up on the interstate. The police tried to stop us. Big and Cassandra had switched out. I'm not sure, but they had switched seats before the police got behind us. Big drove while the police chased us. We stopped at one point, and then he said, ["]I'm not getting in trouble.["] I wanted out, but he pulled off before I could get out. He drove crazy on the interstate. Big was driving when we wrecked. I jumped out. Actually I fell out the side door. I just ran and the dog caught me. The money they found near me came from the store. The gun wasn't mine. I knew this was a mistake. I didn't want to do it, but Big pretty much threatened me into it. No matter what the case is, I'm not going to lie. I saw Big and Cory give Cassandra money before we came out of the store.

Defendant testified that he was at the home of co-defendant Cassandra Haynes on December 2, 2012, visiting a friend. At some point, co-defendant Leveris Keller also arrived at the home. Defendant, Ms. Haynes, Cory Reed, and Mr. Keller later left the home in Mr. Keller's dark-colored van. They drove to the Family Dollar store in the Whitehall area to pick up some snacks and drinks. After everyone got back into the van, they rode around Jackson, and Mr. Keller then drove to the Dollar General Store.

Defendant claimed that Mr. Keller then pulled a gun on Defendant, placed it to Defendant's head, and told him to "mask up, 'We about to rob this store.'" Defendant testified that Mr. Keller gave him a mask and gloves and said, "You gonna rob this store with us." Defendant said he thought that Mr. Keller would shoot him if he did not participate. Defendant testified that he was afraid, got out of the van, and put the gloves and mask on. Defendant, Mr. Keller, and Mr. Reed then went inside the store. He said that Mr. Keller and Mr. Reed both had guns. Defendant testified that Mr. Reed immediately went over to Ms. Buchanan's cash register, and Defendant said that he was "[s]till standing off to the side." He saw Ms. Underwood and Mr. Byrum go outside, so Defendant testified that he "tried to slide out to let them know I ain't with this, you know what I'm saying, I ain't . . ." He said that he spoke with both individuals outside. Defendant testified that while he was outside with Ms. Underwood, Mr. Keller walked outside and placed a gun to her head and told her to give him her number. Defendant testified that Mr. Keller also demanded that Defendant go back inside the store. He said that Mr. Keller was also upset because Defendant allowed Mr. Byrum to leave.

Defendant testified that Mr. Keller held a gun to Ms. Underwood while Mr. Reed held a gun to Ms. Buchanan. He said that Mr. Keller told Ms. Buchanan to hurry up, and he told Defendant to get the money out of Ms. Underwood's register. Defendant complied and placed the money in his pants. Defendant then walked down to Ms. Buchanan's register but Mr. Reed had already taken all of the money out. Defendant testified that they heard police sirens and left the store. They got into the van, and Ms. Haynes drove away. At some point, Ms. Haynes and Mr. Keller switched seats, and Mr. Keller drove the van. Defendant testified that Mr. Keller stopped the van when they got on the ramp to the interstate. Defendant claimed that he was going to jump out of the van but Mr. Keller locked the door and pulled away. Defendant testified that Mr. Keller then led police on a high speed chase until he wrecked the van as they were exiting the interstate.

Defendant testified that he was "shook up" from the accident and wanted to get away from Mr. Keller. He claimed that Mr. Keller was "still gonna get me 'cause I'm the one who got - - I took the money out the register to give him." Defendant said that he ran once he got outside of the van because Mr. Keller was trying to shoot him. He claimed that he was not trying to escape from police.

On cross-examination, Defendant claimed that he did not know Ms. Haynes, and Cory Reed and Leveris Keller were "nothing" to him. He said that he was in Jackson with his mother and went to Ms. Haynes' house to visit her daughter's girlfriend, who was his best friend. Defendant testified that prior to the robbery Mr. Keller pulled out two bandanas and told him to put them on. He said that Mr. Keller also placed a gun to Defendant's head when he told Defendant to "[m]ask up" and threatened him. Defendant agreed that he did not tell Lieutenant Stanfill about Mr. Keller placing a gun to his head but he told Lieutenant Stanfill that Mr. Keller threatened him. He also claimed that Lieutenant Stanfill did not write out his statement correctly. Defendant agreed that he had the opportunity to run away when he was standing outside the store but he chose to stay and went back inside the store. Defendant claimed that he did not tell Ms. Buchanan to give him the "f - - - - - g money." He testified that Ms. Buchanan was lying, and he was telling the truth.

Defendant agreed that during the police chase his pants were stuffed with money, and he was still wearing gloves and bandanas. He also knew that there were guns in the car. Defendant claimed that Mr. Keller was still trying to kill him after the wreck and after police arrived. He also testified that Mr. Keller made him remove one of his shirts after the robbery. Defendant admitted that Mr. Keller never shot at him, and Defendant never asked the officers for any help once they arrived. He ran in the opposite direction. Defendant claimed that he heard the dog barking but he never heard the officers tell him to stop.

Lieutenant Stanfill was recalled as a witness. He said that Defendant never told him that Mr. Keller placed a gun to Defendant's head or that Mr. Keller told Defendant to remove his shirt after the robbery. Defendant also never told Lieutenant Stanfill that Mr. Keller was trying to kill him after the wreck.

**ANALYSIS**

Defendant argues that the evidence is insufficient to support his convictions because there was "admissible evidence that fairly raised the defense of duress." We agree there was evidence that "fairly raised the defense of duress." We disagree that the evidence was insufficient to support the convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are question primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S .W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. " A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State*

*v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The jury found Defendant guilty of aggravated robbery and evading arrest. Defendant contends that the "evidence is insufficient to support [the convictions] because reasonable doubt as to whether [Defendant] acted under duress is present." Duress is not an affirmative defense. Rather, is it a general defense and, as a result, if evidence fairly raises the defense, the State is required to negate the defense beyond a reasonable doubt. *State v. Culp*, 900 S.W.2d 707, 710 (Tenn. Crim. App. 1994); Tenn. Code Ann. § § 39-11-203, -504. Concerning the defense of duress, Tenn. Code Ann. § 39-11-504 provides:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.
>
> (B) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Taken in the light most favorable to the State, the proof showed that Defendant voluntarily got into a van with Cassandra Haynes, Leveris Keller, and Cory Reed. They drove to the Dollar General Store on Airways Boulevard, and Defendant, Mr. Keller, and Mr. Reed went inside the store while Ms. Haynes waited in the van. Although Defendant testified that Mr. Keller placed a gun to his head while in the van and said: "[M]ask up. 'We about to rob this store,'" Defendant did not give that information to Investigator Stanfill at the time of his statement. During the robbery, Defendant and Mr. Reed were wearing bandanas to conceal their identity, and Mr. Keller wore a clown mask. Defendant was also wearing gloves. The surveillance video from the store showed that Defendant and Mr. Keller were armed with handguns, and police recovered a handgun from the path that Defendant took when he fled from police after the robbery. Ms. Buchanan testified that when the three men first came into the store during the robbery they demanded money, and there were guns pointed at her face. She felt as though she was going to die. The proof showed that Defendant walked out of the store at one point during the robbery and had the opportunity to run away, but he stayed and later went back inside the store and took money from Ms. Underwood's register.

The evidence also showed that after the van wrecked Defendant got out of the van with money stuffed in his clothing and fled. Although Defendant claimed that he was running from Mr. Keller because he was afraid that Mr. Keller would kill him, there was no proof that Mr. Keller fired a weapon at Defendant, and Defendant ran in the opposite direction from police who were immediately on the scene. Both Sergeant Moss and Investigator Gilley commanded Defendant to stop as he ran away, and Defendant did not stop until he was apprehended by Sergeant Moss' K-9 partner. The jury was presented with Defendant's defense of duress, but obviously rejected it as is its prerogative. The proof of Defendant's guilt was overwhelming. He is not entitled to relief on this issue.

Accordingly, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

-9-